

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00105-CV

_____

GARY MILLHOLLON AND CAROLE MILLHOLLON, Appellants

V.

ALAN D. DOUGLAS AND PEGGY J. DOUGLAS, Appellees

---

On Appeal from County Court at Law No. 2
Tarrant County, Texas
Trial Court No. 2015-005563-2

---

Before Kerr and Birdwell, JJ.; and Gonzalez, J.[1]
Memorandum Opinion by Visiting Judge Ruben Gonzalez, Sitting by Assignment

---

[1]The Honorable Ruben Gonzalez, Judge of the 432nd District Court of Tarrant County, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to Section 74.003(h) of the Government Code. *See* Tex. Gov't Code Ann. § 74.003(h).

## MEMORANDUM OPINION

### I. Introduction

In three issues, Appellants Gary and Carole Millhollon, sellers of a home, appeal the trial court's judgment on a jury's verdict for Appellees Alan and Peggy Douglas, the home's buyers.[2]  We affirm as modified.

### II. Factual and Procedural Background

On January 17, 2012, Gary, a retired banker,[3] and his wife Carole, a former executive secretary and teacher, moved to Texas and bought a home from real estate developer Lee Hughes's company, Maverick Homes.  Since its construction in 2006, the home had been used as a sales center and model home office, so prior to its sale to the Millhollons no one had taken showers in the house, run a washing machine, or used the house over the weekend.  Maverick Homes had had the home inspected for a structural home warranty on December 9, 2011.  The inspector noted that the lot's drainage functioned properly, and Hughes checked "no" on the seller's disclosure with regard to awareness of any known defects or malfunctions in the plumbing or the aerobic septic system[4] or of any improper drainage conditions.

---

[2]Because all four of the parties testified at trial, we will refer to them by their first names to eliminate any confusion.

[3]Gary worked in commercial lending from 1974 until his retirement in late 2011 or early 2012.

[4]An aerobic septic system flows material in a 2,000-gallon tank through several 500-gallon compartments.  The first compartment is the septic tank and uses

Gary had ordered five inspections of the home before closing on the sale. He noted in a December 5, 2011 email to Paula Kelly, a Maverick Homes employee, "As you have probably guessed, I'm pretty thorough and have spent over $1500 on inspections." One of the inspections was of the home's septic system.

Gary's November 29, 2011 septic system report by Scott Lewis, a certified septic inspector for A-Action Home Inspection Group, noted that the system was functioning adequately but had suffered from poor maintenance. The report further recommended, "Due to the lack of maintenance records, apparent servicing and apparent recent excavation of the septic system, we recommend that the septic tank be pumped out and the interior of the septic tank be inspected for any possible deficiencies that cannot otherwise be detected."

The report also contained a disclaimer that stated, in pertinent part,

> Septic systems are a "buried" component which are hidden from normal general visual surveys and many possible problems may not show themselves at the time of a visual survey and thus we cannot make accurate predictions of the future performance of the system or associated components. Accurate determination of location, condition, or life expectancy of the system components is not possible from any survey.

anaerobic bacteria, the middle compartment uses aerobic bacteria, and the last compartment contains chlorine for last-chance disinfection "because some yards have play sets and things." That is, after the aerobic stage, the system's contents "should be near drinking water state" and are then gravity-fed into the chlorinator and discharged as effluent.

And the report noted, under "How to Prevent Problems," that "[m]any septic systems are doomed from the start because they are put in poor locations or constructed improperly."

In his December 5, 2011 email to Kelly, Gary attached the septic system inspection report and a report on the sprinkler system and told her,

> We should probably discuss these two items as well -- especially the septic system. Although it is shown as "apparently" working on the report, it has not been serviced since the house was built. While I understand that no one was living there, the bathrooms and sinks were used and according to the State of Texas website---
>
> **In compliance with the Texas Commission on Environmental Quality (TCEQ), the owner of an aerobic septic system shall continuously maintain a signed, written maintenance contract with a valid maintenance company.**
>
> When I asked for the name of this company that had the contract, I was told there had not been one since the house had never been sold. We probably just need to have one of the septic companies go out, do a pump out and inspect the interior for any deficiencies. No service means that it's likely that no chlorine has been input in 5 years.

Kelly Millikan, another Maverick Homes employee, responded to Gary's email on December 7, 2011, stating that she had performed some research and that the Tarrant County Health Department required that a maintenance agreement be in place with a certified septic company for any occupied property, providing three annual inspections to make sure the system is functioning properly, "i.e., sprinklers are properly disbursing, wiring in place, caps properly placed, etc." Millikan told Gary that because the maintenance agreement did not include items like chlorine tablets or

4

replacing parts like lines or compressors, Maverick Homes had been performing that maintenance on the house since it was built and had had items inspected, repaired, or replaced, including replacing the compressor the previous December. Millikan told Gary that she had had ANS Wastewater, Maverick Homes's septic contractor, inspect the system on December 6 to see if it needed to be pumped and was advised that it had only eight inches of solid waste, so pumping was not recommended at that time. Millikan told Gary, "Based on the information from your inspector that the system is working and from the inspection from ANS Wastewater, we don't think pumping the system at this time would be in the best interest of the system." She provided him with a contact number at ANS Wastewater and recommended that he get his maintenance agreement paperwork started. On January 8, 2012, Gary signed a contract for three inspections per year with ANS Wastewater to cover January 20, 2013 to January 20, 2014.

When Gary and Carole moved in, they installed a wrought-iron fence on concrete footing to protect their two small dogs from the backyard neighbors' four Rottweilers. Gary hired a contractor who told him he needed a four-inch footing: two inches underground and two inches above ground. He secured approval, and the contractor built the fence.

According to Carole, Texas had been in a drought when they moved in, but on January 25, 2012, 2.15 inches of rain fell,[5] and an additional .46 of an inch fell the next day. Carole described this rain event as a "gully washer," and Gary said that after the rain, water flowed over the new fence's concrete footing and covered the fence with dirt, grass, dead leaves, and trash "because that water was just going through there so hard," on its flow from east to west, and south to north.

After the gully washer, the neighbors told Gary that there had been flooding problems at the house before then, and one of the septic system servicing company's employees told Gary that he had seen the backyard flood "a bunch of times." Five days later, Gary sent an email to Todd Hamilton, who worked for the subdivision's management company, to inform him that his backyard had been flooded by the rain and that the house had almost been flooded. In his email, Gary explained his plan to install a French drain on the southwest hill above the house to the "natural valley between [the] house and the house to the south[,] into the street and rock bed below [the] driveway."[6] Hamilton approved the request on February 1, 2012. Gary hired

---

[5]Before trial began, the Millhollons stipulated to the admissibility of many of the Douglases' exhibits, including a chart listing rainfall in inches at Lake Benbrook, near the property, from January 1, 2012 to December 10, 2015.

[6]Hughes gave the following testimony about the drainage plan Gary had proposed to Hamilton:

> Q. And so if Mr. Millhollon told the homeowner's association that he is going to install a drain that's going to take water behind this wall and take it to this natural valley, how is that possible given this

Romeo Martinez to do the work: building a French drain and removing a berm near the driveway that channeled water into the backyard to direct the water down the driveway.

On February 6, Gary contacted Maverick Homes, and Hughes went out to the house three days later.[7] When Hughes arrived, four or five men were working on removing the berm. Hughes said that he told Gary that "the berm was there to help with the drainage and take some of the water to the south side of the lot down the driveway side and also[] help the drainage going from the south to the north," while minimizing the amount of water that went down the driveway. Hughes also told Gary

picture? How is any engineer . . . going to install a drain that's going to take water from back here up to the top of that hill? I mean, assuming the laws of gravity have not been suspended in this part of Tarrant County.

A. Well, obviously, you couldn't take it from where the four-inch curb existed as I saw it built to -- it would make no sense to take it to the top of that hill if that was your question.

Q. And you couldn't take it from the top of this wall that was never built either, could you? Near the back, the edge of the property, you can't take it from there to this natural valley?

A. Not to the location you're pointing to sir, no.

[7]Gary said that after leaving several unreturned voicemails for Hughes, he sent Hughes an email stating that three of the neighbors and one of Hughes's vendors had told him that there was frequently standing water in the backyard and because Hughes had not divulged this, if Hughes did not meet with him, he would "go to the board of realtors and anybody else, including the attorney general." He said that Hughes appeared the next day.

7

that he thought the concrete footing on the wrought-iron fence "substantially blocked the flow of water from the south to the north and was the cause of the water backing up at that point" and that it was very much like putting a softball in a toilet, flushing it multiple times, and "expecting it not to overflow." Gary denied having ever heard Hughes say anything about a softball in a toilet and said that Hughes had just told him to be careful with the concrete footing because the county and the Army Corps of Engineers did not want anything to impede water flowing downhill.

Gary acknowledged that what he had initially proposed to Hamilton was not what he actually did, but he said that Hughes had total control over any and all approvals and that Hughes told him that it looked fine when he came out and saw what Gary was doing. Gary had no documentation showing the changes that he had made from his approved proposal. Hughes testified that making the driveway on a sloped lot the main drainage for a property would not be a prudent idea because over time, water could cause substantial damage if it seeped underneath the concrete.

Hughes said that he and Gary also talked about the aerobic septic system and that Gary told him that he thought it was placed too low, that water had gotten into the system, that the system's alarm had gone off a couple of times, and that sometimes the toilet in the guest bathroom would not flush. Gary testified that one of the septic system maintenance men told him that when the alarm activated, it was

because the sprinklers or tanks were stopped up, but he denied that the alarm had ever gone off when he owned the house, even when the tanks were filling up.[8]

On February 21, 2012, Martinez charged Gary $4,425 for the work he did on the property; Maverick Homes paid the Millhollons $2,000 to settle their complaints about the septic system and the property's drainage. Carole testified that Martinez's work on the backyard seemed to solve the problem and that after Martinez changed the drainage in the backyard, most of the backyard water went down the driveway. Carole said that they had had parties in the driveway with up to 100 people with no problems with the bathrooms or septic system. Gary likewise testified that after the French drain was installed and the shrubbery removed, they did not have any other problems with drainage.

However, it rained .15 inches on March 29, 2013, and .2 inches the next day; on March 31, a Service Company Plumbing, LLC plumber went to the property "for commode bubbling and not flushing properly."[9] The plumber noted that he "pulled commode, checked stack (offset), reset commode, roto-root[ed] main sewer line for master shower, and flushed commode several times; no bubbling."[10] The plumber

---

[8]Peggy, in contrast, said that before the Douglases replaced the system, the alarm went off "a lot" and had burned up more than one motor.

[9]Carole said that she had noticed tiny bubbles and asked Gary to call a plumber but that she did not hear any gurgling because she "always had the T.V. on."

[10]Alan said that when he saw the March 31, 2013 receipt from the plumber, he knew that it was inaccurate "because when [he] bought the house, it had a bubbling

9

returned a few months later, on August 16, 2013, for a clogged line and determined that the "water level in the tank and sewer line [were] near to the same level[,] resulting in [a] static sewer line from [the] house."

Gary testified that when the plumber came out on August 16, the plumber told him that the water was not moving very well, that he thought the septic system's first tank might be clogged, and that Gary needed to get someone to check the septic system. Gary said that the plumber told him that the line was not static but that it sloped.

Gary called Garrett Aerobic Septic Systems, which came out to the property on August 23, 2013. Gary said that Garrett's employees "dug a hole" and told him that "the top had been destroyed or deteriorated or whatever, and the tank was full of trash and grass and all kinds of things."[11] Garrett's employees told him to hire someone to "suck everything out, and then they told [him] they needed to put a riser on that one tank, and they needed to build a new top for it, and then they needed to

_____

toilet a week after [he] moved in." Carole said that the plumber told her that he had repositioned the toilet because it was not "over the hole enough" and that she thought this had fixed the problem.

[11]Garrett's August 23, 2013 invoice reflects that the Millhollons were charged $75 for "Service Call for toilet not flushing properly," and $50 for "Dug up trash tank concrete plug in tank and flushed out 3-inch line going into trash tank," for a total of $125.

10

replace the sod around it and all that."[12]  So Gary told them to do it, and they did it. Gary said that after taking these actions, he and Carole had no other problems with the system.  Gary took no action to change the slope of the sewer line from the house to the aerobic system "because the aerobic people told [him] that wasn't needed" and water was flowing through fine.

It rained 2.5 inches on September 20, 2013,[13] 1.1 inches on October 14, and .82 inches on October 16.

On October 19, 2013, the Millhollons decided to sell the house and signed a "Seller's Disclosure Notice" form in which they indicated that they were not aware of any defects or malfunctions in the plumbing system or septic/on-site sewer facility and that they were not aware of any improper drainage as of that date.  And although the disclosures asked whether the Millhollons had received any written inspection reports from persons who regularly provide inspections and who are either licensed as inspectors or otherwise permitted by law to perform inspections, they only disclosed two:  a December 2011 home inspection by Lonestar Inspection Service and a

---

[12]Garrett's August 27, 2013 invoice reflects that the Millhollons were charged $125 for "Enlarged hole over trash tank plug, installed [two] 20[-inch] x 12[-inch] tuff-tite riser & 20[-inch] tuff-tite lid," $6 for a bag of concrete, $35 for the Tuff Tite lid, $25 for the 20-inch x 6-inch Tuff Tite riser, and $40 for the 20-inch x 12-inch Tuff Tite riser.  With tax, the total for this work was $244.56.

[13]Carole testified that she had a hip replacement in September 2013, and then a fall at her grandson's house that required extensive surgery, necessitating a move to a house that was not on a hill.

11

December 2011 radon inspection by Madove/DFW Radon. They did not disclose the November 29, 2011 septic system report by Lewis, A-Action Home Inspection Group's certified septic inspector, or the other two reports Gary had referenced when dealing with Maverick Homes prior to the Millhollons' purchase of the home.

The disclosure also asked the seller to list the home's service providers, and the Millhollons listed Atmos for electric, AT&T for cable and phone, and Bob's Cans for trash, but they wrote "N/A" next to sewer and did not mention that they had a contract with ANS Wastewater through January 20, 2014.

Carole testified in her deposition that "[a]s far as [she and Gary] knew at this time [October 19, 2013], this [the seller's disclosure notice was] exactly the truth." She said that she did not provide any of the information because her "husband handles these things," and he filled it out, but that she read it, "and it was correct, and [she] signed it."[14] Gary said that he had filled out the disclosures truthfully and that he did not understand them to require a whole history but rather the house's condition as it was when they put it up for sale.

---

[14]Carole testified that she and Gary had owned eight houses over the course of their thirty-five-year marriage. After she retired, they would buy a house out of foreclosure, fix it up, live in it for three or four years, and then sell it, working their way up to having a "really nice home." She knew how to paint, lay tile, and refinish cabinets, but they hired handymen to handle the complex work, like the installation of toilets. Carole said that they did not have to do much to the home at issue other than replace the carpet because of wear caused by pedestrian traffic and business use during its time as a model home and sales office.

The Millhollons provided the seller's disclosure notice to Alan, who was also a banker,[15] and his wife Peggy, a realtor,[16] around four months later, in February 2014, a month during which virtually no rain fell.

The real estate contract with the Millhollons was the first one Peggy had done since reactivating her license, and she used the standard contract form for "One to Four Family Residential," promulgated by the Texas Real Estate Commission (TREC), to prepare their offer, filling in the blanks, including the one next to "Acceptance of Property Condition," where the Douglases checked, "Buyer accepts the Property in its present condition." Because a real estate agent would have made three percent of the sales price on the transaction, using Peggy's real estate license on the sale saved the Millhollons $12,420 in the buyer's commission. Carole said that they had discounted the house's price because Peggy was not going to charge a commission. Neither party was represented by counsel, and Peggy testified that she and Alan could not have negotiated an "as-is" contract with the Millhollons without

---

[15]Alan worked in financing commercial and residential real estate.

[16]Peggy had been a realtor for over twenty years but had not been active for most of that time. She had a GED and some college education and had worked as a real estate agent in Texas from 1983 to 1995. A year before she went inactive in Texas (1994), seller disclosures came out, changing Texas from a "buyer beware" state. Peggy became licensed in Florida in 2006 but was only active for six weeks in 2013 before they moved. She reactivated her Texas license in January 2014 after taking 30 hours of online courses.

13

legal counsel because the state would not let her, as a real estate agent, do that without representation for both parties.

The Douglases' home inspector visited the home for five hours on February 22, 2014, noting in his report that the day was "Clear/Sunny," and he listed a number of defects in his twenty-page property inspection report but noted that inspection of the septic system was "limited to what is easily accessible/observable," and recommended that a reputable septic company be consulted. Carole was at home when the Douglases' home inspector visited the house. Gary was not at the house for the inspection, although he acknowledged that he had said in his affidavit in an earlier court filing that he had been there.

On February 25, 2014, Aerobi-Tech, an aerobic septic specialist, inspected the home's septic system for the Douglases and reported that the "system [was] working fine." Alan said that when Aerobi-Tech inspected the system, it had not rained for a while and that he did not know to tell either the home inspector or the septic specialist to look for specific issues such as drainage or to check the slope of the sewer line or the risers' water-tightness. Alan testified that if he had known about the plumber's August 2013 comment about the static sewer line, he could have directed the home inspector to look for the cause and to find a solution to it.

The parties executed a repair addendum on March 3, 2014, providing that the Millhollons would address nine items identified in the home inspector's report, which included "Structural Systems" and "Plumbing System" categories. The structural

14

systems that the home inspector had identified in his report and that the Millhollons agreed to correct pertained to some cosmetic issues with the home's foundation and the home's gutters: the "[d]ownspout extension at the front of the home [was] crushed/collapsed," the gutter downspout at the home's rear was not connected to the drainage system, and the gutter system over the garage area had a small amount of debris "suggest[ing that] the slope may not [have been] adequate to discharge the water effectively." The home inspector recommended repairing the former, connecting the rear downspout to the drainage system, and resloping the garage gutter to ensure water discharged properly.

The plumbing system issues identified by the home inspector pertained only to "[m]ultiple exterior hose bibs . . . missing the back-flow/anti-siphon device," which he recommended replacing "to eliminate the potential for contaminated water to be siphoned into the home[']s fresh water system," and a lack of an access point for repairs to the pump and mechanical equipment for the master bathroom hydro-massage therapy tub.[17] In response to these items, Gary purchased and installed back-flow devices on all three outdoor faucets (hose bibs) and checked with the builder, who explained how a repairman would access the tub for motor repairs.

---

[17]Other items that the inspector identified and recommended repairing and which the Millhollons agreed in the addendum to have fixed included some roof damage, some minor door problems, and some minor electrical and HVAC issues.

On April 24, 2014, the Millhollons sold the home to the Douglases. Alan said that before closing, their only discussions with the Millhollons about the septic system had been about routine maintenance and that the Millhollons never mentioned anything about the alterations they had made to the property's drainage or any of the problems they had experienced. Alan said that the Douglases relied on their home inspection report to make the addendum to the sales contract but that they "100% relied on" the Millhollons' disclosures.

Carole said that the Millhollons' disclosures were true, adding, "I don't know if it was because the torrential rains or anything [experienced by the Douglases after the purchase], but we did not lie on that disclosure." Gary said that he did not tell the Douglases prior to closing about the history of what he had fixed on the property "because it was working properly." Gary said that the difference between Hughes's disclosures and the Millhollons' disclosures, which were identical to Hughes's, was that the Millhollons had corrected the septic and drainage problems such that on the date of their disclosures, there were no problems.

Not long after the purchase, however, the Douglases began to experience issues with the home's plumbing, septic system, and drainage. Alan said that five days after moving in, they noticed a toilet start bubbling and, sporadically, a little bit of "odor" and slow flushing.[18] Alan said that when there was no rain, the plumbing

---

[18]There was no rainfall reported until May 9, 2014, when 1.06 inches of rain fell.

16

would work fine during the week when he and Peggy were not at home, but on the weekends, showering, doing laundry, and using the bathroom would cause the system to back up. Peggy said that the problems did not occur every day. The Douglases signed an annual maintenance agreement for the septic system with Lone Star Aerobic Service Company with a start date of June 1, 2014, and an end date of May 31, 2015. The record does not reflect whether any maintenance company inspections were conducted between the end of the January 20, 2014 contract that the Millhollons had with ANS Wastewater and the start of the Douglases' contract with Lone Star.

On June 13, 2014, Lone Star made a service call. Lone Star's inspector indicated that the various components tested had an "operative" status and stated, "Only found one septic spray head. Office will get design from county to see where other spray heads should be."

Alan called Gary seventy-seven days after the Douglases moved in, on July 10, 2014, to ask about what they were seeing and experiencing with the house. At that point, in addition to the 1.06 inches of rainfall on May 9, there had also been the following rainfall amounts in inches: 1.5 on May 13, .3 on May 14, .38 on May 25, .32 on May 26, .41 on May 27, 1.38 on June 9, 1.4 on June 22, .63 on June 23, and .8 on June 25, in addition to some lesser amounts on June 8 (.09), June 10 (.23), June 13 (.11), June 24 (.18), and July 3 (.13). Alan said that within an hour or two of even a slight rain—a quarter to a half an inch—the septic system's alarm would go off and the system would not function properly. He "often had to get a sump pump and

17

pump from the chlorinated tank just so [they] could use the house when it was raining." Alan said that without the sump pump, the system's alarm went off "about every hour" when significant rainfall occurred.

Gary replied by email on July 11, 2014. In his email, he told Alan about his experience with the house, including that in December 2011, his home inspector had told him to get the aerobic septic system checked out, and Hughes had told him to call ANS Systems and had told him that Maverick Homes had not maintained the system because the house was not being lived in. Gary told Alan that he had called ANS, who told him that the company that had built the septic system had "gone broke" but that they would inspect it, told him that "all was fine and working properly,"[19] and offered to maintain it for $175/year.

Gary further told Alan in his July 11, 2014 email,

> During the first year, we had a huge rain and water was flooding the backyard. It was only inches from the patio and I had to squeegee it off the patio until the rain stopped. . . . I hired a landscape engineer[20] who

---

[19]Gary did not mention anything about what Lewis, the certified septic inspector who conducted the November 29, 2011 inspection, said about how the system had suffered from poor maintenance.

[20]Gary testified that he did not remember the name of the landscape engineer or architect that he contacted because he had called three or four others first. One came out to the property, and he made a sketch while they were talking. Carole said that the landscape engineer who came to the house "just drew a little funny drawing, and it was going to be, like, $17,000, and we couldn't afford it, and we checked around, and we got a referral." When asked if they had kept the drawing, Carole said she did not know because she trusted her husband to take care of it.

18

came out and told me that there were two problems. 1) the natural drainage from the land was the driveway and 2) it would be adequate to allow most of the water to flow down the driveway to the street and gully but that the dense, 7 foot shrubs that were all along the top of the driveway was acting as a dam and diverting the water to the backyard. He also said that I should install a French drain through the low part of the back yard so that any excess water would go down on the north side. I did all of this and had to re-sod the back yard at a cost of around $8500. I went after Hughes hard and he coughed up $5,000 of the cost[21] (I only bring this part in to show you how I had to threaten Hughes to fix this problem after he misrepresented on the disclosure and checked that no drainage problems were ever experienced.)

We kept having problems with the toilet in the small bathroom near the office. It would not flush. I had a plumber come out who scoped everything and said that the problem was the septic. That [there was] no riser built on the first tank and there was no cover on it. He said that it was 100% full and that with each rain, water and trash would flow into it making the situation worse. I had to hire two companies—one to clean out the tanks and a second to put in concrete, a riser[,] and a top. After that, the toilet worked fine and the system was working well. The cost for all of that was around $750. I did not pursue Hughes for that— didn't have the time.

---

When asked who designed the drain that he built for the Millhollons, Martinez testified that he and Gary did it. Martinez testified that he had no formal education as a landscaper, architect, or engineer but had been installing drains for the last nine years. The fence with the concrete footing was already in the yard when he installed the drain. Carole stated, "I realized that [Martinez] is not an expert, but we're just kind of normal people, and we hire people with experience," since all they wanted was a French drain so that the flat part of the backyard would not hold standing water.

Alan said that in the three years that he had been living with the lawsuit, he had never seen the name of the landscape engineer or architect that the Millhollons had hired to design the house's drainage.

[21]During his testimony, Gary said that it was only $2,000 that he had gotten from Hughes.

In his email, Gary also told Alan that he had capped one of the septic system's two sprinkler heads to keep effluent from running down the driveway where his grandson played and that a contractor had told him that if the sprinkler ever stopped up, the alarm would sound before the last tank got full. Gary told Alan how to uncap the second sprinkler head and said that he had no idea what Hughes had submitted to the county about the system because he had not checked "into that aspect of the deal,"[22] but he opined that Hughes had probably used a subpar contractor. Gary stated in his email, "I do know that the septic system worked fine ever since we had the work done and we had no problems after that time."

Three days later, on July 14, 2014, Dee Scarbro of Lone Star Aerobic inspected the septic system and concluded that the system was causing an unsafe environment for the Douglases and their neighbors because the original design, marked "used for inspection," required three spray heads, the original plan required a night-timed sprayer control but the control panel had no timer mechanism installed, the riser joints were sealed with spray foam that was not designed to be used in wet application areas or in connection with electrical wiring, the wire connections inside the tank were

---

[22]In an April 6, 2015 email to Alan, Gary said, "There is nothing recorded with the county on where the aerobic sprinkler heads are located. I checked all of that out when I bought the house." During trial, Gary admitted that he had not checked with the county on anything before he sold the house to the Douglases and that he never went to the county to try to find the aerobic system's design. He admitted that he nonetheless told Alan in an email that there was nothing on file with the county about where the sprinkler heads were supposed to be.

exposed, and the original plan required "landscape and terrace as need[ed] to minimize runoff" but "this was apparently never performed and the slope allows for runoff."

Communications between the parties broke down between 2014 and 2015, with Gary testifying that they had different opinions and that he was "tired of hearing about the drainage." And then Carole was in a serious accident on January 3, 2015, when a truck ran a red light.[23]

On April 10, 2015, an employee of Helton-Ingram Environmental Services inspected the septic system; there was still only one sprinkler head operating. William Ingram, Helton-Ingram's CEO and a state-certified installer II[24] of aerobic septic systems, testified that while the system could be operated that way, it was illegal to do so because it was inconsistent with the county-approved design.

On June 2, 2015, Ingram went to the house to complete the installation of a new control panel on the system. He returned on June 11, when Alan asked him to figure out why there were still issues with the system. Ingram said that the system

---

[23]Gary testified that he was very distracted during this time because Carole had to have multiple surgeries to repair fourteen pelvic fractures, three breaks in her arm, and some back injuries.

[24]Ingram explained that an installer II license was a step above installer I and the highest level in the industry for installing, repairing, and maintaining aerobic septic systems.

21

"was full of water and wasn't ejecting the water properly."[25]  He cleared the effluent pump's clogged filters and then dug to try to identify the problem with the inlet pipe portion from the house.

Ingram determined that the height difference in pipe level was going in the wrong direction from the house, stating, "We should have [a minimum] fall at eight-inch per foot from the house to the tank . . . [but instead] [h]e had four inches of up[-]grade, going uphill from the home to the tank, which is also placing that inlet pipe partially under water at normal operating level. About half the pipe was under water." He concluded that the whole system was buried around 6 inches too shallow in the ground, that the system's risers needed to be replaced because they were loose and not sealed well to each other, and that the system had been infiltrated "at some point," based on the grass and other items that he found in the tank.  He recommended installing a new system, at a cost of $12,260.

Ingram also concluded that any significant rainfall would cause the system to malfunction and that the alarm would sound every time that happened, stating,

> It would have backup issues.  You would have cross-tank contamination, materials leaving one compartment to the other.  Some materials would probably even return back to the home, trying to flush. Microorganisms would probably be getting pumped out on to[p] of the yard, being that they're in the pump tank. They're not supposed to be in there, but

---

[25]While there was no rainfall during the first two weeks of June 2015, May 2015 had been fairly damp, with twenty out of thirty-one days reporting some rainfall. Nine of those twenty days had at least half an inch of rainfall, and five of those days had at least one inch of rainfall.

they've moved between compartments because they're flooded. The stuff all gets pushed out on top of the yard. Eventually, with the slope, it would probably run right back to his septic system and get pumped out and the process repeated again, over and over.

Ingram stated that he would not have been surprised that the Aerobi-Tech inspector found that the system was working properly in April 2014 if it had not rained in a month.

Harrington Environmental Services, LLC d/b/a Harrington Septic & Environmental Services came out on July 3, 2015, and confirmed Ingram's diagnosis, noting, "It appears that the tank was not installed deep enough, causing the inlet pipe to stay full of water."

On September 23, 2015, the Douglases sued the Millhollons for fraud in a real estate transaction under Business and Commerce Code Section 27.01 and for violations of the Deceptive Trade Practices Act (DTPA). *See* Tex. Bus. & Com. Code Ann. §§ 17.46(a), (b)(24), 17.50(a)(1)(B), 27.01(a)(1).

In July 2016, Circle G Landscape Services designed a drainage system for the property. Clay McCook, Circle G's operations manager, testified that the main issue addressed was handling water that had been moving across and down the driveway, leading to cracking in the concrete. Circle G installed a six-inch curb around the driveway to create a backstop, tied the house's down spouts into the drainage system, and added a French drain system to connect into a pipe to the street; the work that pertained strictly to the drainage installation and work around the new septic system

23

cost $9,885. In August 2016, Martinez extended the drain that went from south to north on the property for $2,000. Alan said that before the septic system was replaced and the drainage system corrected, water would pool around the septic system tanks seventy percent of the time.

Chris Mitchell, who had an installer II certification, installed the Douglases' new septic system on July 15, 2016, after measuring the slope of the septic line from the house to the existing system. Mitchell described the system's problem, stating, "Starting at the house and going to the trash tank, it was going uphill to the trash tank," by 2.5 inches—essentially, everything coming out of the house was having to go uphill. The cost of removing the old system, permitting for the new system, and installing the new system was $9,860. Ingram opined that the $9,860 bid was an "underbid" job.

On October 12, 2016, the Douglases had $5,870 worth of work done on the driveway to replace the concrete that had cracked because of water draining over and under it.

The Douglases sought recovery for all of the post-suit work as well as the testing and inspections ($85 for Harrington Services, $175 for Helton-Ingram) and for a septic system compressor that had burned up in the interim ($495).

Alan gave the following answers when asked by his attorney about whether he would have purchased the property if he had known about all of its problems:

24

Q. Would you have purchased this property from Mr. and Mrs. Millhollon had any of the following been disclosed? That the inlet pipe from the house was level or went uphill to the aerobic system?

A. No.

Q. That the tanks weren't sealed from water?

A. No.

Q. That the tanks took on water during significant rain?

A. No.

Q. That the aerobic system became basically inoperable with significant rain?

A. No.

Q. That the tanks and the structure was buried too shallow in the ground?

A. No.

Q. Or was not set at the right depth?

A. No.

Q. That there was often a bad smell in the bathroom right off the kitchen and that the shower backed up and toilet didn't flush sometimes in that bathroom?

A. No.

Q. That the water levels in the tanks were level or near to the same level?

A. No.

Q. You simply wouldn't have bought the house?

25

A. Correct.

Q. Why is that?

A. Too many problems.[26] Can't live in it.

Q. As far as the drainage situation, would you have purchased the property had you known that the drainage had been altered to change most of the flow of the water from the natural flow of south to north to east to west?

A. No.

Q. Would you have bought the property had you known that the drainage system had been altered to the point that the drainage had been changed from south to north to the use of the driveway for most of the water in the backyard?

A. No.

Q. Now, are you asking that the jury find that Mr. and Mrs. Millhollon in their disclosures misrepresented this house in terms of the drainage and aerobic system?

A. Yes.

Q. And are you asking that they find that their actions were committed knowingly?

A. Yes.

Q. And what do you base that on, please?

A. Gary's e-mail and other information we've gained through the discovery process. The invoice that he provided of a plumber that did work on the house that found the static line. It's just one thing after the

---

[26]Alan said that all of the documentation showed that the Millhollons had a history of problems with the house of the same type that the Douglases did.

other that he either told me after we closed or we found out through depositions and discovery.

Peggy agreed with Alan's answers and said that they had had no discussions with the Millhollons prior to the April 24, 2014 closing regarding the drainage or aerobic septic system or any of the changes the Millhollons had made. Peggy said that it would have been impossible for the Millhollons to have lived in the house without experiencing the same problems.

Alan opined that the Millhollons had breached the contract as of the date of closing because they could have amended their October 19, 2013 disclosures but did not and the contract specifically stated that all "representations . . . in this contract survive closing" and that "if any representation of Seller in this contract is untrue on the Closing Date, Seller will be in default." He said that none of the superficial, cosmetic-type deficiencies revealed by the home inspection caused him to question the credibility of the Millhollons' disclosures, which he and Peggy had relied on.

Gary acknowledged that if he had known at the time of the closing that the septic system needed to be replaced or that there was improper drainage, he should have disclosed it. But he stated that there was nothing wrong with the septic system when they sold the house and that "[i]t was working perfectly." He said that he did not give the Douglases the plumbing invoices because the Douglases did not ask for them. He said that the Douglases had asked for inspection reports on the house, and he did not consider the plumbing invoices to be inspection reports.

27

A little over two years after the Douglases sued the Millhollons,[27] a six-member jury found in the Douglases' favor after four days of hearing evidence, answering the following questions unanimously.

Questions 1 and 4 asked the jury whether the Millhollons had engaged in any false, misleading, or deceptive act or practice that the Douglases relied on to their detriment and that was a producing cause of damages to the Douglases and defined "producing cause" and "false, misleading, or deceptive act or practice." "Producing cause" was defined as "a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred," and "False, misleading, or deceptive act or practice" was defined as

1. Failing to disclose information about the Property that was known at the time of the sale of the Property if such failure to disclose such information was intended to induce the Douglases to enter into the transaction that they would not have entered into if the information had been disclosed.

2. Representing that the Property had characteristics that it did not have or was of a particular quality which it did not have.

3. Representing that an agreement confers or involves rights, remedies or obligations which it did not have or involve, or which are prohibited by law.

4. Representing that work or services had been performed on the Property when such work or services had not been performed.

---

[27]Peggy said that they sued Carole because she had signed off on the disclosures after living in the home for two years, stating, "They had all the knowledge, both of them, equally."

The jury answered "yes" to Questions 1 and 4.

Questions 2 and 5 asked the jury whether the Millhollons had engaged in any unconscionable action or course of action that was a producing cause of damages to the Douglases, reciting the same definition of "producing cause" as in Questions 1 and 4 and explaining that an unconscionable action or course of action "is an act or practice that, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." The jury answered "yes" to Questions 2 and 5.

Because the jurors responded affirmatively to Questions 1, 2, 4, and 5, they were also instructed to answer Questions 3 and 6, which asked whether the Millhollons engaged in any such conduct "knowingly," which was defined as "actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question or actual awareness of the conduct constituting a failure to comply with a warranty," and which the instruction explained could be inferred "where objective manifestations indicate that a person acted with actual awareness."[28] The jurors were further instructed in Questions 3 and 6 to consider only the conduct they had found was a producing cause of damages to the Douglases. The jury answered "yes" to Questions 3 and 6.

_____

[28] *See* Tex. Bus. & Com. Code Ann. § 17.45(9) (defining "knowingly" under the DTPA).

Questions 7 and 9 asked the jury whether the Millhollons had committed statutory fraud against the Douglases and defined statutory fraud as occurring when (1) there is a false representation of a past or existing material fact, (2) the false representation is made to a person for the purpose of inducing that person to enter into a contract, and (3) the false representation is relied on by that person in entering the contract. The jury answered "yes" to Questions 7 and 9.

Because the jurors answered Questions 7 and 9 affirmatively, they were also instructed to answer Questions 8 and 10, which asked whether they found by clear and convincing evidence that the Millhollons were actually aware of the falsity of the representation found to be fraud in Questions 7 and 9. "Clear and Convincing Evidence" was defined as "the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established." The jury answered "yes" to Questions 8 and 10.

Questions 11, 12, 13, 14, and 15 pertained to damages. In Question 11, the jury was instructed to consider only the loss of the benefit of the bargain and out-of-pocket expenses in determining compensatory damages resulting from the conduct inquired about in Questions 1, 2, 4, 5, 7, or 9. The jury found $29,320 for loss-of-benefit-of-the-bargain damages and the same amount for out-of-pocket expenses. In Questions 12 and 13, the jury found $40,000 from each Millhollon as the amount, in addition to actual damages, that should be awarded to the Douglases because the Millhollons' conduct was committed knowingly. In Question 14 (as to Gary) and

Question 15 (as to Carole), the jury was asked about exemplary damages to be assessed against the Millhollons and found $50,000 as to Gary and $1,000 as to Carole. Questions 16 and 18 asked about attorney's fees.[29]

Question 17 asked whether the Millhollons were in default in any of the material contractual obligations to the Douglases at the time of the closing between the parties. The jury answered "yes" to Question 17.

The Millhollons filed a motion for judgment notwithstanding the verdict (JNOV) in which they argued that the jury's answers to Questions 1 through 16 should be disregarded because the Douglases had failed to allege and prove fraud in the inducement to negate the "as is/in its present condition" provision in the contract, which they argued superseded the alleged misrepresentations and negated causation for the DTPA and statutory fraud claims, and because there was no evidence of reliance or producing cause when the Douglases testified that they had relied on their chosen inspectors to close on the home.[30] The Millhollons also argued

---

[29]In response to Question 16, the jury awarded $110,000 to the Douglases for representation up until the time of trial, $15,000 in attorney's fees through appeal to this court, $5,000 in attorney's fees for representation at the petition for review stage in the supreme court, and $10,000 in attorney's fees for representation through oral argument and completion of a proceeding in the supreme court. In response to Question 18, the jury indicated that a reasonable fee for the Millhollons' attorney for preparation and trial was $35,000, for an appeal to this court was $15,000, and for an appeal to the supreme court was $10,000.

[30]Before the trial began, the Millhollons' attorney complained that fraudulent inducement had not been pleaded, seeking to avoid trying the issue by consent. During the charge conference, he again raised his fraudulent inducement argument,

31

that there was no evidence that they knew there was "improper drainage" or a defect with the septic system on October 19, 2013, the day that they signed the disclosures, or on the date of closing; no evidence of a problem occurring with regard to these items that would have put them on notice of a defect; and no evidence of the cause of the damages to the driveway, no evidence that the French drain was not performing as expected, no evidence of why it was necessary to continue the drain to the ditch, and no evidence of proximate or producing cause of the damages to the driveway. They complained that there was no evidence that any of the above damages were foreseeable or that they caused, proximately caused, or were the producing cause of any of the Douglases' damages. And they contended that the jury's response to Question 17 should be disregarded because there was no evidence that they had breached the contract.

In their motion to modify the judgment, the Millhollons renewed their "as is" and fraud-in-the-inducement arguments and incorporated by reference their motion for JNOV.

The trial court rendered a judgment in accordance with the jury's verdict, awarding to the Douglases $29,320 in actual damages, $50,000 in additional damages against Gary, $40,000 in additional damages against Carole, and $110,000 in attorney's

argued that there was no evidence of any false, misleading, or deceptive act or practice by the Millhollons or of the Douglases' reliance, and argued that there was no evidence to support the submission of Questions 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, and 17. The trial court overruled these objections.

32

fees, in addition to conditional appellate attorney's fees. The trial court denied the

Millhollons' motion for JNOV and motion to modify the judgment.

## III. Discussion

In their first and second issues, the Millhollons argue that the trial court erred

by denying their motion for JNOV and motion to modify the judgment because (1)

there was no evidence that they made any misrepresentations of fact, (2) the property

was purchased "in its present condition," or "as is," which they claim was not negated

by a pleading and proof of fraud in the inducement, (3) the Douglases had retained

experts to inspect the property so that there was no reliance and no producing cause,

and (4) they did not breach the contract and are therefore due their attorney's fees. In

their third issue, the Millhollons argue that the trial court erred by rendering judgment

for the Douglases because there was no evidence to support the jury's findings to

Questions 1–15 and 17.[31] We will consider the three issues together.

## A. Legal Sufficiency Standard of Review

We may sustain a legal sufficiency challenge—that is, a no-evidence

challenge—only when (1) the record discloses a complete absence of evidence of a

___

[31]As set out above, the Millhollons' arguments about the lack of evidence to support finding misrepresentations of fact, reliance, and producing cause correspond to Questions 1, 4, 7, and 9. Their complaint about no proof of fraud in the inducement also corresponds to Questions 7 and 9, and their complaint about the lack of evidence to support the jury's finding that they breached the contract corresponds to Question 17. Their complaints about sufficiency of the evidence to support damages correspond to Questions 11, 12, 13, 14, and 15.

33

vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).[32]

Scintilla means a spark or trace. *Scintilla*, Black's Law Dictionary (10th ed. 2014). Anything more than a scintilla of evidence is legally sufficient to support a finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996). More than a scintilla exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins.*, 77

---

[32]A trial court may disregard a jury verdict and render a JNOV if no evidence supports the jury findings on issues necessary to liability or if a directed verdict would have been proper. *See* Tex. R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991). A directed verdict is proper only under limited circumstances: (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent; or (2) when the evidence is insufficient to raise a material fact issue. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Playoff Corp. v. Blackwell*, 300 S.W.3d 451, 454 (Tex. App.—Fort Worth 2009, pet. denied) (op. on reh'g).

S.W.3d 253, 262 (Tex. 2002); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). On the other hand, when the evidence offered to prove a vital fact is so weak that it creates no more than a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983); *see King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

Both direct and circumstantial evidence may be used to establish any material fact. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). A fact is established by circumstantial evidence when it can be fairly and reasonably inferred from other facts proved in the case. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). But to withstand a legal sufficiency challenge, circumstantial evidence still must consist of more than a scintilla. *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995).

Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony, and reviewing courts cannot impose their own opinions to the contrary. *City of Keller*, 168 S.W.3d at 819. Jurors may choose to believe one witness and disbelieve another. *Id.* (explaining, for example, that if both parties in a traffic accident testify they had the green light, an appellate court must presume that the prevailing party did and that the losing party did not). They may disregard even uncontradicted and unimpeached testimony from disinterested witnesses, although they may not ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily

35

controverted, and they are not free to believe testimony that is conclusively negated by undisputed facts. *Id.* at 820.

## B. Applicable Law

"[A] seller of real estate is under a duty of disclosing material facts which would not be discoverable by the exercise of ordinary care and diligence on the part of the purchaser, or which a reasonable investigation and inquiry would not uncover." *Smith v. Nat'l Resort Cmties., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979). However, a seller has no duty to disclose facts he does not know and is not liable for failing to disclose what he only should have known. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995) (stating that absent any specific knowledge of asbestos in the building, seller was not obliged to raise the subject).

Property Code Section 5.008, "Seller's Disclosure of Property Condition," requires a seller of residential real property to give the purchaser a written notice that "contains, at a minimum, all of the items in the notice prescribed by [that] section." Tex. Prop. Code Ann. § 5.008(a). At the top of the form, the seller's disclosure must include a statement in capital letters that the notice "is a disclosure of seller's knowledge of the condition of the property as of the date signed by seller and is not a substitute for any inspections or warranties the purchaser may wish to obtain. It is not a warranty of any kind by seller or seller's agents." *Id.* § 5.008(b).[33] Subsection (d)

---

[33]Property Code Section 5.008(b) has been amended several times since the inception of this case. *See* Act of May 22, 2013, 83rd Leg., R.S., ch. 695, § 6, 2013

36

further provides that the notice "shall be completed to the best of the seller's belief and knowledge as of the date the notice is completed and signed by the seller." *Id.* § 5.008(d); *see Bynum v. Prudential Residential Servs., Ltd. P'ship*, 129 S.W.3d 781, 792, 795 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (op. on reh'g) (noting that section 5.008's plain language "requires only that the form be completed to the best of the seller's belief at the time the notice is completed and signed," and holding, on appeal of no-evidence summary judgment, that because there was no evidence that the defendant-sellers actually knew that the bathroom had been remodeled without the necessary permits, there was no evidence that they had intentionally made a misrepresentation in their section 5.008 disclosure).

The statutory seller's disclosure notice contains a list of items on the property, including "plumbing system" and "septic system," the presence of which the seller is to identify. Tex. Prop. Code Ann. § 5.008(b). The seller is then to indicate whether he or she is aware of any of the identified items that are not in working condition, that have known defects, or that are in need of repair, and a "yes" answer requires a description. *Id.* The seller must also disclose if he or she is "aware of any known defects/malfunctions in," among other things, the "Plumbing/Sewers/Septics" and the driveway, and a "yes" answer requires a description. *Id.* The seller is also asked if

---

Tex. Sess. Law. Serv. (amended 2015, 2017, 2019) (current version at Tex. Prop. Code Ann. § 5.008). None of the amendments have affected the provisions pertinent to this case, so we cite the current code for the convenience of the parties and public.

he or she is aware of conditions such as improper drainage, and a "yes" answer requires an explanation. *Id.* And the seller must indicate whether he or she is aware of any item, equipment, or system in or on the property that is in need of repair, and a "yes" answer requires an explanation. *Id.*; *see Birnbaum v. Atwell*, No. 01-14-00556-CV, 2015 WL 4967057, at *7 (Tex. App.—Houston [1st Dist.] Aug. 20, 2015, pet. denied) (mem. op.) ("Knowledge of past repairs does not establish knowledge of a defective condition.").

In the TREC form contract signed by the parties, section 7, "Property Condition," lists subsections A through H.[34] Subsection A, "Access, Inspections and Utilities," provides that the seller will permit the buyer and his agents access to the property for inspections. Subsection B, "Seller's Disclosure Notice Pursuant to §5.008, Texas Property Code (Notice)," instructs the parties to check one box only and lists the following options:

> (1) Buyer has received the Notice.
> (2) Buyer has not received the Notice. Within _____ days after the effective date of this contract, Seller shall deliver the Notice to Buyer. If Buyer does not receive the Notice, Buyer may terminate this contract at any time prior to the closing and the earnest money will be refunded to Buyer. If Seller delivers the Notice, Buyer may terminate this contract

---

[34]Only subsections A, B, and D are pertinent to the issues before us. Subsection C states that a seller's disclosure about lead-based paint is required by federal law. Subsection E pertains to lender-required repairs and treatments. Subsection F pertains to the completion of all agreed repairs and treatments prior to the closing date. Subsection G addresses environmental matters such as the presence of wetlands or toxic substances, and Subsection H mentions residential service contracts.

for any reason within 7 days after Buyer receives the Notice or prior to the closing, whichever first occurs, and the earnest money will be refunded to Buyer.

(3) The Seller is not required to furnish the notice under the Texas Property Code.

The parties checked option (1), and the record reflects that the Millhollons provided a notice to the Douglases.

Subsection D, "Acceptance of Property Condition," once more instructs the parties to check one box only and lists the following options:

(1) Buyer accepts the Property in its present condition.

(2) Buyer accepts the Property in its present condition provided Seller, at Seller's expense, shall complete the following specific repairs and treatments: _____. (Do not insert general phrases, such as 'subject to inspections' that do not identify specific repairs.)

NOTICE TO BUYER AND SELLER: Buyer's agreement to accept the Property in its present condition under Paragraph 7D(1) or (2) does not preclude Buyer from inspecting the Property under Paragraph 7A, from negotiating repairs or treatments in a subsequent amendment, or from terminating this contract during the Option Period, if any.

The Douglases checked the first option under subsection D.

In *Volmich v. Neiman*, No. 02-12-00050-CV, 2013 WL 978770, at *3 (Tex. App.—Fort Worth Mar. 14, 2013, no pet.) (mem. op.), and again in *Naquin v. Cellio*, No. 02-16-00117-CV, 2017 WL 2178873, at *2 (Tex. App.—Fort Worth May 18, 2017, no pet.) (mem. op.), we acknowledged that we, and other Texas courts, have interpreted the contract language, "in its present condition," to be an agreement to purchase the property "as is," and that a valid "as is" agreement, with some

exceptions, will prevent a buyer from holding a seller liable if the item sold turns out to be worth less than the price paid.

However, an "as is" clause may not be enforced when the buyer is induced to enter into the contract by a seller's fraudulent representation or concealment of information. *Prudential*, 896 S.W.2d at 162 (holding that a buyer who agrees, freely and without fraudulent inducement, to purchase commercial real estate "as is" cannot recover damages from the seller when the property is later discovered not to be in as good a condition as he believed it was when he inspected it before the sale);[35] *see Warehouse Assocs. Corp. Ctr. II, Inc. v. Celotex Corp.*, 192 S.W.3d 225, 230–31 (Tex. App.—Houston [14th Dist.] 2006, pets. denied) (concluding that the *Prudential* exceptions "still stand, subject to a small exception to the fraudulent-inducement exception carved out by *Schlumberger* [*Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex.

---

[35]In *Prudential*, the buyer, a knowledgeable real estate investor who owned an interest in at least 30 commercial buildings and who was president of a Dallas commercial property management firm that had developed, built, rehabilitated, owned, or managed properties valued altogether at around $100 million, discovered that the four-story office building that he bought "as is" contained asbestos two years after the purchase. 896 S.W.2d at 159. Under the terms of the parties' sales agreement, the buyer had acknowledged that he was not "relying upon any representation, statement or other assertion with respect to the Property condition" and was instead relying on his own "examination of the Property." *Id.* at 160. The court noted that "[w]hile it should not be necessary in every 'as is' provision to go into this much detail, [the] contract leaves no doubt exactly what [the buyer] agreed to," which negated the causation element of his DTPA and fraud claims. *Id.* at 161 (observing that the buyer did not assert fraud in the inducement of the "as is" agreement). The court also observed that there was no evidence that the seller actually knew about the asbestos. *Id.* at 162.

1997)]"); *see also Volmich*, 2013 WL 978770, at \*4. That is, a seller cannot assure a buyer of the property's condition in order to obtain the buyer's agreement to buy it "as is" and then disavow the assurance that procured the "as is" agreement. *Prudential*, 896 S.W.2d at 162.

And even absent fraudulent inducement, an "as is" clause still may not be enforceable depending on the nature of the transaction and totality of the circumstances surrounding the agreement, including the parties' sophistication and whether they were represented by counsel, whether the contract was made at arm's length, the parties' relative bargaining power and whether the contractual language was freely negotiated, and whether the clause was an important part of the parties' bargain and not simply "boilerplate." *Id.* at 162; *see Schlumberger*, 959 S.W.2d at 180–81 (emphasizing, with reference to *Prudential*, that a disclaimer of reliance will not always bar a fraudulent inducement claim and discussing sophisticated businesspersons' representation by "highly competent and able legal counsel" in arm's length transaction); *see also Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 332 (Tex. 2011) (explaining that while fraudulent inducement is almost always grounds to set aside a contract despite a merger clause, in certain circumstances, it may be possible for a contract's terms to preclude a fraudulent inducement claim by a clear and specific disclaimer-of-reliance clause, i.e., when sophisticated parties represented by counsel disclaim reliance on representations about a specific matter in dispute); *Volmich*, 2013 WL 978770, at \*3 (citing *Prudential*, 896 S.W.2d at 161).

41

Regardless of the presence of an "as is" clause, however, when false and fraudulent representations are made about a contract's subject matter but the person to whom they are made conducts an independent investigation into the same matters covered by the representations before closing and discovers the representations' falsity, the causation and reliance elements of DTPA and fraud claims are negated. *Volmich*, 2013 WL 978770, at *5–6;[36] *see Mead v. Gray*, No. 02-16-00177-CV, 2017 WL 1738066, at *3 (Tex. App.—Fort Worth May 4, 2017, pet. denied) (mem. op.) ("In determining whether a buyer's independent inspection conclusively negates reliance and causation in a buyer's claim based on a seller's failure to disclose information, courts look to whether the buyer ultimately possessed the same information and knowledge as the seller.");[37] *see also Cellio*, 2017 WL 2178873, at *5 ("[T]he

---

[36]In *Volmich*, we held that even if the plaintiffs had shown evidence of the defendants' misrepresentations about, or their failure to disclose, a roof leak, summary judgment in the defendants' favor was not erroneous when the independent inspection commissioned and reviewed by the plaintiffs before purchasing the home "revealed numerous existing or past problems with the home, including previous roof repairs, leaks, and moisture damage and moisture-related deterioration throughout the house." 2013 WL 978770, at *7. We made clear, however, that we were not holding that an independent inspection would always bar DTPA and fraudulent inducement claims. *Id.* at *8.

[37]In *Mead*, we affirmed the trial court's summary judgment for the sellers when the buyers, one of whom was a licensed realtor, retained their own property inspector who performed an independent inspection of the home and noted "signs of minimal foundation settlement" in two areas of the home, as well as "deficiencies" such as hairline cracks and patching on interior walls, cracks in the exterior brick veneer, open caulk joints around the exterior sides of windows, a cracked floor tile, open grout joints and caulk separation in the kitchen's backsplash, and deficiencies in five interior

independent inspection that Naquin commissioned and reviewed before deciding to purchase the home supersedes any alleged misrepresentation or failure to disclose by the Cellios.");[38] *Williams v. Dardenne*, 345 S.W.3d 118, 125 & n.4 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (stating that a buyer's independent inspection precludes a showing of causation and reliance if it reveals to the buyer the same information that the seller allegedly failed to disclose and observing that some of the courts have articulated different tests to reach the same general rule).

---

and three exterior doors—the same problems that the buyers claimed they only discovered after moving into the home. 2017 WL 1738066, at *1, *3–4.

[38]In *Cellio*, the inspection report prepared by the plaintiff's inspector "revealed numerous existing or past problems with the home, including problems with the home's structural systems, its grading and drainage systems, and its sprinkler system," and "that the pool side commode needed further evaluation and possible correction" because it "appeared to be 'excessively loose at the floor mount.'" 2017 WL 2178873, at *1, *5. The plaintiff purchased the house "in its [then] present condition" after she received the report. *Id.* at *1. Accordingly, two years later, when the plaintiff sued, alleging that the defendants had made misrepresentations in their disclosures about the plumbing and septic systems, the pool house, an unpermitted sprinkler system, and improper drainage, we upheld the trial court's summary judgment for the defendants despite the plaintiff's allegations that the pool house commode "flushed untreated sewage onto the lawn." *Id.* at *1–3, *5. *But cf. id.* at *5–6 (Sudderth, J., concurring) (stating that "[i]t was only when Naquin discovered toilet paper and human feces in her back yard behind the pool house that she realized something was amiss" and that a toilet with a loose base would not put a buyer on notice that the sewage pipes would dump raw sewage into the backyard). The concurrence noted that because Naquin did not produce evidence in response to the Cellios' no-evidence summary judgment motion to explain why it was reasonable for her to rely on the Cellios' misrepresentations rather than the inspection report and why the Cellios' concealment of the defect rather than the inspector's failure to discover it caused her damages, the trial court did not err by granting summary judgment. *Id.* at *7–8 (Sudderth, J., concurring).

## C. Application

As set out by the parties, we must consider whether the Millhollons made misrepresentations and whether the Douglases could have relied on those misrepresentations, as well as whether the Douglases' failure to plead a common law fraudulent inducement claim can defeat their recovery and whether the Millhollons breached the contract.

### 1. Misrepresentations

The Millhollons argue that no evidence was introduced to prove that their real estate disclosures were false when made and that the only evidence is that they made repairs to the drainage and septic system but that there were no problems after the repairs and no known defects or improper drainage on October 19, 2013, when they signed the disclosures. And they contend that the circumstantial evidence of what occurred at the home after the April 24, 2014 closing is insufficient to support the jury's answers because the Douglases were required to prove that the Millhollons knew on October 19, 2013, that their representations were false[39] and that the Millhollons knew that water going across the driveway would damage it and create improper drainage.

---

[39]The Millhollons argue that the Douglases presented no evidence that the Millhollons had used the facilities during a significant rain and that the Douglases only called repair companies in 2015 when the rainfall increased significantly.

Over the course of four days of evidence, the jury learned that Gary had ordered five inspections before he purchased the home but only disclosed two and that one of the inspections he did not subsequently disclose to the Douglases was a November 29, 2011 inspection of the home's septic system by a certified septic inspector, who recommended further inspection of the system. Gary also did not reveal until after closing that in February 2012, he opted not to hire a landscape engineer or architect to remedy backyard flooding, some of which might have been caused by his installation of a wrought-iron fence on a concrete footer, because it would have cost $17,000.[40] Instead, he paid $4,425 to Martinez, who had no formal education as a landscaper, architect, or engineer, to remove a berm that blocked the flow of water from the driveway and to install a drain that was supposed to keep water from pooling in the backyard. While both Carole and Gary testified that they had no other problems with the property's drainage after these repairs, their changes sent more water down the driveway,[41] which ultimately led to the cracking of the driveway's concrete. Gary also chose to rely on Maverick Homes's representations that it had been properly maintaining the septic system when he purchased the home

---

[40]The Douglases ultimately paid almost $12,000 to correct the drainage system.

[41]At some point, Gary also capped one of the septic system's two sprinkler heads to keep effluent from running down the driveway, which was inconsistent with the design approved by the county, and thus illegal, but Gary would not have known that because he never looked into the system's design.

and then subsequently settled his dispute with Maverick Homes about both the drainage and the septic system problems for $2,000.

Although Gary denied having heard Hughes's statement about the wrought-iron fence's concrete footing causing water to back up into the backyard, the jury could have chosen to recall Hughes's statement that it was "like putting a softball in a toilet" and flushing, leading to an overflow (flooding), and Alan's testimony that before he and Peggy replaced the septic system and corrected the drainage system, water would pool around the septic system tanks seventy percent of the time, to conclude that the Millhollons had been less than candid about the continuing drainage problems on the property when they signed the disclosures in October 2013.[42]

Further, in March 2013, the Millhollons called a plumber because their toilet was "bubbling and not flushing properly," and when the plumber returned to their home in August 2013 on another service call, he determined that there was a static sewer line. Gary said that after he hired people to make repairs to the septic system, they had no other problems, even though he took no action to change the slope of the sewer line. It rained 2.5 inches one day at the end of September 2013, 1.1 inches on October 14, and .82 inches on October 16, just a few days before the Millhollons

_____

[42]The record reflects that there was also significant rain on October 27 (.62 inches), November 5 (.45 inches), November 6 (.46 inches), November 22 (1.22 inches), November 25 (.58 inches), December 6 (.6 inches), December 7 (.63 inches), and December 21 (1.97 inches) but very little rain in January 2014 (.08 for the entire month), and virtually no rain at all in February 2014 (.13, .01, and .02 respectively, on February 4, 9, and 15).

46

signed the disclosures on October 19, 2013. While Carole testified that their decision to sell the house had been motivated by her hip replacement, the jury could have found the timing of the Millhollons' decision to sell was also triggered by the septic system's tendency to stop functioning properly during a heavy rainfall. The jury likewise was entitled to find from the evidence in this record that the Millhollons' failure to make accurate disclosures, reveal unflattering inspections, or mention their history with the house's drainage and septic systems at the time that the Douglases had the house and septic system inspected was done knowingly to induce them into entering into the contract and took advantage of the Douglases' lack of knowledge to a grossly unfair degree. *See City of Keller*, 168 S.W.3d at 819. Accordingly, we overrule this portion of the Millhollons' three issues.

## 2. Reliance

The Millhollons argue that no evidence was introduced to prove that the Douglases relied on the disclosures rather than the experts they hired to inspect the home. The Douglases respond that because their inspections did not reveal the defects that were not disclosed or that were misrepresented, their reliance on the disclosures, and thus the chain of causation, was not defeated, arguing that the cases cited by the Millhollons "all involved situations where pre-closing inspections or reports turned up the exact problems which were the subject of later DTPA claims, or at least the conditions that were the subject of the buyers' claims."

47

"[W]hen a person makes his own investigation of the facts, and *knows* the representations are false, he cannot, as a matter of law, be said to have relied upon the misrepresentations of another." *Camden Mach. & Tool, Inc. v. Cascade Co.*, 870 S.W.2d 304, 311–13 (Tex. App.—Fort Worth 1993, no writ) (emphasis added) (holding that seller's failure to disclose prior foundation repair could not support recovery when buyer was aware, before sale, that foundation had significant problems); *see also Cole v. Johnson*, 157 S.W.3d 856, 857–59, 861 (Tex. App.—Fort Worth 2005, no pet.) (holding trial court did not err by granting summary judgment for sellers when sellers provided ample disclosure of foundation repair history).

We addressed a similar set of facts, including a seller's making disclosures, in *Kessler v. Fanning*, 953 S.W.2d 515 (Tex. App.—Fort Worth 1997, no pet.). The Fannings bought the Kesslers' home after visiting the house on several occasions and having the house inspected by a professional inspector. *Id.* at 517. The Kesslers checked "no" on the disclosures with regard to whether they were aware of improper drainage or previous structure repairs on the property. *Id.* at 518. It rained during the inspection, but the Fannings were not made aware of, and did not see, any drainage problems on the property before they moved in, and the inspection did not include the yard or its drainage "because that was not a concern at that time." *Id.* at 517. However, the Fannings saw standing water or "ponding" almost immediately after moving in and called the Kesslers, who acknowledged that they were aware of it. *Id.* at 517.

48

The Fannings sued the Kesslers for violating the DTPA, claiming that they had made misrepresentations and omissions about the drainage and condition of the home to induce the Fannings to buy it. *Id.* at 518. A jury found that the Kesslers had violated the DTPA by engaging in a "false, misleading, or deceptive act or practice that was a producing cause of damages" to the buyers. *Id.* at 520. On appeal, the Kesslers argued, among other things, that any producing causal connection had been broken by the Fannings' reliance on the inspection. *Id.* at 519. However, we stated, "The *possibility* of an independent investigation that *might* have uncovered fraud does not preclude recovery of damages for fraudulent representations," and held that the Fannings' inspection was not a defense to the misrepresentation claim. *Id.* (emphasis added) (citing *Koral Indus. v. Security-Connecticut Life Ins.*, 802 S.W.2d 650, 651 (Tex. 1990) (per curiam)).[43] In a later portion of the opinion, we noted, "The record shows that standing water would not drain from the yard after periods of heavy rains, a

---

[43]In *Koral*, the insurance company refused to pay benefits based on fraudulent inducement and misrepresentations after the company's insured, who had failed to disclose damaging medical history, died within what the insurer claimed was the contestable period of the policy. 802 S.W.2d at 650–51. The court noted that failure to use due diligence to suspect or discover someone else's fraud does not bar the defense of fraud to the contract because—in the absence of knowledge to the contrary—the injured party would have a right to rely and act upon the false statements; "the wrongdoer in such a case cannot be heard to complain that the other should have disbelieved his solemn statements." *Id.* at 651 (quoting *W. Cottage Piano & Organ Co. v. Anderson*, 101 S.W. 1061, 1064 (Tex. App.—Fort Worth 1907, writ denied)).

condition that a one-time inspection may not reveal without notice of the problem." *Id.* at 520.

The Millhollons direct us to *Bartlett v. Schmidt*, 33 S.W.3d 35, 38–40 (Tex. App.—Corpus Christi–Edinburg 2000, pet. denied), to support their argument that a buyer's decision to undertake any independent investigation indicates that he is not relying on the seller's representations about the property. *Bartlett* was an appeal of a judgment on a jury verdict for the buyer-plaintiff, a German citizen, who had purchased property intending to use it for commercial purposes. *Id.* at 36–37 & n.1. The seller had orally advised the buyer that there were no use restrictions on the property; the title company likewise represented that there were no use restrictions on the property, as did the buyer's attorney. *Id.* at 36–37. There were, in fact, restrictions limiting the property to residential use only, and a jury found the seller liable for negligent misrepresentation, fraud, and DTPA violations. *Id.* at 37.

Because the buyer had his own counsel review the conveyancing documents "specifically to assure that no restrictions would interfere with his development of the property for his intended purpose," the court held that he did not rely on the seller's representations, defeating his fraud and negligent misrepresentation claims. *Id.* at 38. And because the buyer undertook his own investigation after the seller's representations and expressed his reliance upon the title commitment rather than the seller's representations, his DTPA claim was likewise defeated because he could not show the producing cause element. *Id.* at 40–41. Notwithstanding *Bartlett*'s broad

50

language, however, the Corpus Christi–Edinburg court's legal analysis is merely a repeat of the general rule that a buyer's independent inspection precludes a showing of causation and reliance if it reveals to the buyer the *same* information that the seller allegedly failed to disclose. *See Williams*, 345 S.W.3d at 125; *see also Pleasant v. Bradford*, 260 S.W.3d 546, 553 n.3 (Tex. App.—Austin 2008, pet. denied) (explaining, with regard to *Bartlett*, that the Corpus Christi–Edinburg court "was not stating that *any* evidence of an investigation defeats an allegation of reliance, but rather that there was legally sufficient evidence of an unimpaired investigation by the buyer sufficient to show a lack of reliance on the seller's representations" (emphasis added)); *Celotex*, 192 S.W.3d at 244–45 (pointing out that *Bartlett* did not involve as-is or waiver-of-reliance language and did not cite *Prudential* or *Schlumberger* and holding that to the extent *Bartlett* held that a buyer's independent investigation, without more, is sufficient as a matter of law to defeat a fraudulent inducement assertion, it was contrary to *Prudential*, *Schlumberger*, and cases cited therein).

The Millhollons also direct us to the portions of the *Cellio* and *Volmich* opinions in which we quoted *Bartlett*, stating, "The common thread of the decisions reaching this conclusion is that, *regardless of the result of his investigation*, the buyer's decision to undertake such an investigation indicates that he or she is not relying on the seller's representations about the property." *Cellio*, 2017 WL 2178873, at *4 (quoting *Bartlett*, 33 S.W.3d at 38 (emphasis added)); *Volmich*, 2013 WL 978770, at *5 (quoting *Bartlett*, 33 S.W.3d at 38 (emphasis added)). However, in the immediately preceding sentence

51

in both opinions, we made clear that the independent investigation must be "into the matters covered by the [allegedly false and fraudulent] representations." *Cellio*, 2017 WL 2178873, at *4; *Volmich*, 2013 WL 978770, at *5. That is, it is the investigation into the *same* matters covered by the false or fraudulent representations that breaks the chain of causation and reliance on those representations. *See Cellio*, 2017 WL 2178873, at *4; *Volmich*, 2013 WL 978770, at *5.

Here, the Douglases' home inspector visited the home on a clear and sunny day towards the end of a month when virtually no rain fell, and three days later, an aerobic septic specialist inspected the septic system and reported that it was "working fine." Because the Douglases did not know the property's history of drainage and septic system problems, they did not know to direct their home inspector or septic system specialist to look for specific issues with the property's drainage, to check the sewer line's slope, or to check any other problems specific to the inner workings of the septic system—a problematic "black box" according to the septic system report that the Millhollons did not disclose. While the home inspector did note some minor issues with the home's gutters, the Douglases did not know to ask him to determine how water drained from the backyard, and the lack of rainfall precluded the subsequent drainage and septic issues from arising for either of their inspectors or from their firsthand discovery prior to closing. *See Kessler*, 953 S.W.2d at 517–20.

Further, the only plumbing issues identified by the inspector pertained to hose bibs missing their back-flow/anti-siphon devices and a problem with the master

52

bathroom's hydro-massage therapy tub, i.e., nothing to do with the toilet that had a history of bubbling or the sewer connection to the septic tank. And Alan testified that while he and Peggy had relied on the home inspection report for the repair addendum, they otherwise relied "100%" on the Millhollons' disclosures, and the jury was entitled to believe this testimony. Accordingly, we overrule this portion of the Millhollons' three issues.

### 3. Fraudulent Inducement

The Millhollons argue that the Douglases' failure to plead and submit to the jury an issue on fraud in the inducement precluded them from defeating the "as is" clause and obtaining a judgment against them.

Fraudulent inducement is a species of common law fraud that shares the same basic elements as fraud but that arises only in the context of a contract. *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018) (explaining that Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations). Thus, in a traditional (common law) fraudulent inducement claim, the plaintiff must prove both the existence of a contract, *see id.*, and that (1) the defendant made a representation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation, he knew it was false or made it recklessly, as a positive assertion; (5) the defendant made the representation with the intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and (7) the representation caused the

53

plaintiff injury. *Volmich*, 2013 WL 978770, at *4 (citing *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011) (op. on reh'g)); *see also Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964) (explaining that "[a]ctual fraud usually involves dishonesty of purpose or intent to deceive").

The Douglases did not plead a traditional fraudulent inducement claim, and a question on traditional fraudulent inducement was not submitted to the jury.[44] However, the Douglases also did not plead a breach-of-contract or warranty claim. Instead, they pleaded a statutory fraud claim, which requires that the buyer be induced into entering into the contract by relying on a false representation of a past or existing material fact, and they pleaded a DTPA claim, one basis for which—as set out in the jury charge—required a finding that the seller's failure to disclose information the seller knew about the property was intended to induce the buyer into the transaction. *See* Tex. Bus. & Com. Code Ann. §§ 17.46(a), (b)(24), 17.50(a)(1)(B), 27.01(a)(1); *Payne v. Highland Homes, Ltd.*, No. 02-14-00067-CV, 2016 WL 3569533, at *8 (Tex. App.—Fort Worth June 30, 2016, no pet.) (mem. op.); *see also Lindley v. McKnight*, 349 S.W.3d 113, 128 (Tex. App.—Fort Worth 2011, no pet.) (observing that the elements of statutory fraud are essentially identical to those of common law fraud except that section 27.01 does not require proof of knowledge or recklessness as a prerequisite to

---

[44]In their reply brief, the Millhollons clarify that, pursuant to the pattern jury charges, a jury question for fraud in the inducement is submitted after a defense like the "as-is" clause is raised.

54

the recovery of actual damages); *Pierre v. Tilley*, No. 02-06-00308-CV, 2007 WL 2067757, at *3 (Tex. App.—Fort Worth July 19, 2007, pet. denied) (mem. op.) (same); *see generally Cellio*, 2017 WL 2178873, at *1–4 (observing that the plaintiff raised only DTPA and statutory fraud claims but addressing elements of common law fraud-in-the-inducement claim in discussion of "as is" clause and reliance).

In their reply brief, the Millhollons complain that unlike common law fraudulent inducement, "knowledge of the falsity" and "intent" to induce action are not elements of statutory fraud under Business and Commerce Code Section 27.01. But the legislature has specified that in the statutory fraud cause of action, there must be a false representation of a past or existing material fact that is made "for the purpose of inducing" another to enter into a contract, i.e., made with the intent to induce the other party into entering into the contract. *See* Tex. Bus. & Com. Code Ann. § 27.01(a)(1)(A). And if the actor makes the false representation with "actual awareness" of the falsity, he is liable to the defrauded person for exemplary damages. *Id.* § 27.01(c). Likewise, a third person who has actual awareness of the falsity of the actor's representation, who fails to disclose it to the defrauded person, and who benefits from the false representation also commits fraud and is liable to the defrauded person for exemplary damages. *Id.* § 27.01(d). And under the DTPA, failing to disclose information about the property that was known at the time of the sale—if such failure to disclose was intended to induce the plaintiffs to enter into the

55

transaction that they would not have otherwise if the information had been disclosed—raises both the intent to induce and knowledge of the false representation.

The jury was so charged and thus found both "knowledge of the falsity," i.e., "actual awareness," and intent with regard to the fraudulent-inducement elements in these statutory causes of action. Accordingly, we overrule this portion of the Millhollons' three issues. Based on our resolution of this portion of their three issues, we need not address their argument about the "as-is" clause's viability based on the parties' sophistication or the Douglases' response that the "as-is" clause was contradicted and superseded by the contract's repair addendum. *See* Tex. R. App. P. 47.1.

### 4. Breach of Contract

The jury found that the Millhollons were in default with regard to "any of the material contractual obligations to the Douglases at the time of the closing between the parties." The Millhollons argue that this jury response should be disregarded because there was no evidence that they breached the contract when the disclosures were not part of the contract or incorporated therein and lacked mutual promissory obligations; therefore, they should have been awarded their attorney's fees. The Douglases respond that all parties understood and agreed that the disclosures were an integral part of the contract under paragraph 7(B). Specifically, they refer us to Gary's testimony that he understood that the disclosures were part of the contract and to Alan's testimony reflecting the same. The Douglases argue that the Millhollons'

56

"patently false disclosures" were a breach of the parties' contract on the date of closing.

The jury clearly agreed with the Douglases. The contract required that the Douglases "receive[ ] the [section 5.008] notice," which was supposed to disclose to them the Millhollons' knowledge of the condition of the property as of the date they signed it on October 19, 2013. The Millhollons claimed that their disclosures were true. The Douglases argued that the disclosures were false in light of the property's septic system and drainage conditions when it rained—which the Millhollons were aware of as the property's residents and as the owners who had made various repair decisions and which the Douglases discovered only after closing—and they put on evidence about rain before and after the disclosure-signing date, which was less than two years after the Millhollons moved in on January 17, 2012. Because the jury had sufficient evidence before it to determine the Millhollons' credibility, we overrule this portion of the Millhollons' third issue. *See City of Keller*, 168 S.W.3d at 819.

### 5. Damages

In the remainder of their third issue, the Millhollons challenge the sufficiency of the evidence to support the jury's findings to Questions 11, 12, 13, 14, and 15, arguing that their conduct was not the proximate cause or producing cause of any damages.

In response to Question 11, the jury identified $29,320 as the "benefit of the bargain" damages sustained by the Douglases and the same amount as their out-of-

57

pocket expenses. The trial court rendered a judgment for the Douglases for $29,320 in actual damages.

The Millhollons argue that the evidence shows that it was the Douglases' failure to maintain the septic system pursuant to Lone Star Aerobic Services' July 2014 recommendations that led to their replacement of the system and that there was no evidence that the repairs to the driveway or drainage systems were necessary as a result of the Millhollons' conduct.

Gary's undisclosed November 29, 2011 septic system report indicated that the septic system was functioning adequately but had suffered from poor maintenance, and the jury could have chosen to disbelieve that Maverick Homes had properly maintained the system and to believe that the Millhollons' repairs to the system had been merely band-aids to nurse the faulty system until the next rain, rendering their disclosures false and fraudulent, and thus the proximate or producing cause of the Douglases' damages. *See id.* The Douglases obtained more than one bid to replace the system—one of the bids was $12,260, while they opted to go with the lower, $9,860 bid—after they solicited input from more than one company about what to do. The Douglases also sought recovery for the septic system testing and inspections ($85 for Harrington Services, $175 for Helton-Ingram) and for a septic system compressor that had burned up in the interim ($495).

The Millhollons did not dispute having changed the house's drainage, and the Douglases presented evidence that these changes—rather than fixing the problem—

made it worse. They also presented evidence that they spent $5,870 to replace the concrete that had cracked as a result of water draining over it and that they spent $9,885 for a new drainage installation and $2,000 for Martinez to complete the connection of the originally installed French drain to the street. In addition to testimony, the jury had photographic evidence to consider with regard to the extension of the drain to the street and of the geography of the house and backyard. Based on all of the evidence, the jury could have reasonably concluded that the Millhollons' conduct required the Douglases' corrective actions and that the Millhollons' failures to disclose evidenced an unconscionable course of action.

Based on all of these figures supported by the record, we conclude that the Douglases showed $28,370 in out-of-pocket damages.[45] *See Anderson*, 550 S.W.3d at 614 (explaining that out-of-pocket damages are measured by the difference between the value expended and the value received, while benefit-of-the-bargain damages are measured by the difference between the value as represented and the value received). We therefore sustain this portion of the Millhollons' third issue in part and reform the judgment to reflect $28,370 in lieu of $29,320.

The charge predicated Questions 12 and 13 on the jury's affirmative answers to Questions 3 and 6 with regard to whether the Millhollons *knowingly* engaged in

---

[45]Our review of this portion of the Millhollons' sufficiency challenge is complicated by the fact that neither party has directed us to evidence to support or challenge the full amount of actual damages awarded by the jury.

violating the DTPA. *See* Tex. Bus. & Com. Code Ann. § 17.45(9). Under the DTPA, if the jury finds that the defendant committed his conduct knowingly, the plaintiff may recover—in addition to the amount of economic damages found by the trier of fact—damages for mental anguish as found by the jury and up to three times the amount of economic damages. *Id.* § 17.50(b)(1). The jury identified $40,000 each as the sum of money that should be awarded to the Douglases from Gary and from Carole because their conduct was committed knowingly. Having found that the Millhollons acted knowingly, the jury could have awarded up to three times the amount of actual damages, but although the jury assessed $40,000 against Gary in response to Question 12, the trial court did not include this amount in the judgment; accordingly, we will not consider the sufficiency of the evidence to support the jury's answer to Question 12.

The trial court included in the judgment the $40,000 assessment against Carole in response to Question 13, and the Millhollons do not challenge the amount itself; the record reflects that Carole signed the disclosures, and based on the record before us, the jury could have found that she did so while knowing that they were false. Accordingly, we overrule this portion of the Millhollons' third issue.

Questions 14 and 15 were predicated on the jury's affirmative answers to Questions 8 and 10, with regard to whether the jury found by clear and convincing evidence that Gary and Carole had actual awareness of the falsity of the representation in Questions 7 and 9 (statutory fraud). The jury identified $50,000 as

60

the sum of money to be assessed against Gary as exemplary damages in response to Question 14, and the trial court included this amount in the judgment. In response to Question 15, the jury identified $1,000 as the sum of money to be assessed against Carole as exemplary damages, but the trial court did not include this amount in the judgment, accordingly, we will not consider the evidentiary sufficiency to support the jury's answer to Question 15.

The jury charge listed the following factors for the jury to consider in calculating their exemplary damages award: the nature of the wrong, the character of the conduct involved, Gary's degree of culpability, the situation and sensibilities of the parties concerned, the extent to which Gary's conduct offends a public sense of justice and propriety, and Gary's net worth. No evidence was presented about Gary's net worth, but otherwise, the jury had ample evidence to consider with regard to Gary's actions in failing to disclose his superior knowledge of the home's situation prior to its sale. Based on our resolution of the issues above, we conclude that the evidence is sufficient to support the jury's award, and we overrule this final portion of the Millhollons' third issue.

## IV. Conclusion

Having overruled all but a portion of the Millhollons' third issue, we modify the trial court's judgment to reflect $28,370 in lieu of $29,320 in actual damages and affirm the trial court's judgment as modified.

/s/ Ruben Gonzalez
Ruben Gonzalez
Visiting Judge


Delivered:  November 27, 2019